# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

| | | |
|---|---|---|
| NOE VEGA RAMOS; ANA KAREN VALENZUELA SOTO; JOSE ADRIAN LEYVA; and ANA KAREN QUIROZ, | § § § § | Case No. 2:17-CV-01298-JDC-KK |
| Individually and on Behalf of All Others Similarly Situated | § § § | |
| Plaintiffs, | § § | |
| v. | § § | JUDGE CAIN |
| BIG EASY FOODS OF LOUISIANA, L.L.C., and MELCHOR MAYA SOTO, | § § § | |
| Defendants. | § | MAGISTRATE JUDGE KAY |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR RULE 23 CLASS CERTIFICATION

## TABLE OF CONTENTS

Contents

I.  FACTUAL BACKGROUND.................................................................................................. 1

  a.  Defendants systematically abused the temporary H-2B visa program. ............................. 3

  b.  Defendants discriminatorily, and in breach of contract, required the Mexican H-2B workers—but not the U.S. workers--to work numerous hours each workweek for which they were not compensated, and made illegal deductions further reducing their pay. ...................... 7

  c.  Defendants imposed upon Plaintiffs and class members discriminatory job-related requirements and adverse terms and conditions of employment to which U.S. employees were not subjected, and exposed the H-2B workers to an objectively hostile and abusive work environment on account of their race, national origin, and/or alienage.................................... 14

II.  LEGAL STANDARD ...................................................................................................... 17

III.  ARGUMENT.................................................................................................................. 17

  a.  The requirements of Rule 23(a) are each satisfied............................................................ 17

    1.  The Class clearly meets the numerosity standard....................................................... 17

    2.  There are multiple common issues of fact and law. ................................................... 20

        Plaintiffs' claims are typical of the claims of the class. ................................................. 24

i

3............................................................................................................................. 24

    4.    Plaintiffs and Plaintiffs' Counsel Can Adequately Protect the Interest of the Class.. 24

  b.  The Requirements of Rule 23(b)(3) Have Been Met.......................................................... 26

    5.    Common Questions Predominate. ............................................................................. 27

## TABLE OF AUTHORITIES

**CASES**                                                           Page(s)

*Adickes v. Hellerstedt,*
No. 17-50899, 2018 U.S. App. LEXIS 29034 (5th Cir. 2018)…………………………….. 25

*Allapattah Servs., Inc. v. Exxon Corp.,*
333 F.3d 1248, 1260-61 (11th Cir. 2003)…... …………………………………………….22

*Aviles-Cervantes v. Outside Unlimited, Inc.,*
276 F. Supp. 3d 480 (D. Md. 2017) ……………………………………………………….21

*Bell Atl. Corp. v. AT&T Corp.,*
339 F.3d 294 (5th Cir. 2003) ………………………………………………………… 27

*Bowe v. Pub. Storage,*
318 F.R.D. 160 (S.D. Fla. 2015) …………………………………………………………...21

*Bremiller v. Cleveland Psychiatric Inst.,*
195 F.R.D. 1 (N.D. Ohio 2000) ……………………………………………………… 24

*Brown v. Cook County,*
332 F.R.D. 229 (N.D. Ill. 2019) ………………………………………………………29

*Brown v. Nucor Corp.,*
576 F.3d 149 (4th Cir. 2009) …………………………………………………….…28

*Brown v. Nucor Corp.,*
2012 WL 12146620 (D.S.C., Sept. 11, 2012) ……………………………………………... 29-30

*Casilao v. Hotelmacher LLC,*
No. CIV-17-800-SLP, 2021 U.S. Dist. LEXIS 18817 (W.D. Okla. Sep. 30, 2021) ……… 19, 28

*Cooper v. Fed. Reserve Bank of Richmond,*
467 U.S. 867 (1984) ……………………………………………………………… 29

*Covarrubias v. Capt. Charlie's Seafood, Inc.,*

2011 U.S. Dist. LEXIS 72636 (E.D.N.C. 2011) ……………………………………....19

*Cruz v. TMI Hosp., Inc.*,
No. 14-cv-1128 (SRN/FLN), 2015 U.S. Dist. LEXIS 147479 (D. Minn. 2015) …………. 24

*Cuellar–Aguilar v. Deggeller Attractions, Inc.*,
812 F.3d 614 (8th Cir. 2015) ………………………………………………………… 21

*DeLeon-Granados v. Eller & Sons Trees, Inc.*,
497 F.3d 1214 (11th Cir. 2007) ……………………………………………………… 30

*EEOC v. WC&M Enters.*,
496 F.3d 393, 399 (5th Cir. 2007) ……………………………………………………18, 22

*Favrot v. Favrot*,
68 So. 3d 1099 (La. App. 4 Cir. 2011) ……………………………………………… 20

*Feder v. Elec. Data Sys. Corp.*,
429 F.3d 125 (5th Cir. 2005) ………………………………………………………… 25

*Floyd v. Bowen*,
833 F.2d 529 (5th Cir. 1987) ………………………………………………………… 17

*General Telephone Co. of Southwest v. Falcon*,
457 U.S. 147 (1982) ………………………………………………………………… 17

*Gene & Gene LLC v. BioPay LLC*,
541 F.3d 318, 325 (5th Cir. 2008) …………………………………………………… 20

Gutierrez v. LVNV Funding, LLC,
No. EP-08-cv-225, 2009 U.S. Dist. LEXIS 54479 (W.D. Tex. Mar. 16, 2009) ……………18

*Ibe v. Jones*,
836 F.3d 516 (5th Cir. 2016) ………………………………………………………… 19

*IberiaBank v. Broussard*,
907 F.3d 826 (5th Cir. 2018) ………………………………………………………… 20

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014) ……………………………………………………… 20, 27, 29

*International Brotherhood of Teamsters v. United States*,
431 U.S. 324 (1977) ………………………………………………………………… 29

*Jimenez v. GLK Foods, LLC*,

No. 12-C-209, 2014 U.S. Dist. LEXIS 75977 (E.D. Wis. 2014) ............................. 28, 30

*Harris v. Forklift Systems, Inc.*,
510 U.S. 17 (1993) ..............................................................................22

*Hernandez v. Yellow Transp., Inc.*,
670 F.3d 644 (5th Cir. 2012) ................................................................ 22

*Howard v. Cook Cty. Sheriff's Office*,
No. 17 C 8146, 2019 WL 3776939 (N.D. Ill. Aug. 12, 2019) ................................24

*Kase v. Salomon Smith Barney, Inc.*,
218 F.R.D. 149 (S.D. Tex. 2003) ........................................................... 22

*Kolbe v. BAC Home Loans Serv., LP*,
738 F.3d 432 (1st Cir. 2013) ............................................................... 21

*Lauderdale v. Tex. Dep't of Criminal Justice*,
512 F.3d 157 (5th Cir. 2007) ............................................................... 22

*Miller v. Mackey International, Inc.*,
452 F.2d 424 (5th Cir. 1971) ............................................................... 17

*Moodie v. Kiawah Island Inn Co., LLC*,
309 F.R.D. 370 (D.S.C. 2015) ........................................................... 19, 21,
28, 30

*Mullen v. Treasure Chest Casino LLC*,
186 F.3d 620 (5th Cir. 1999) ............................................................... 18

*National Railroad Passenger Corp. v. Morgan*,
536 U.S. 101 (2002) .......................................................................... 22

*Perez-Perez v. Progressive Forestry Servs.*,
Civil No. 98-1474-KI, 2000 U.S. Dist. LEXIS 414 (D. Or. 2000) ...........................30

*Recinos-Recinos v. Express Forestry, Inc.*,
233 F.R.D. 472 (E.D. La. 2006) ....................................................19, 28, 30

*Rodriguez v. Hermes Landscaping, Inc.*,
No. 17-2142, 2018 U.S. Dist. LEXIS 151454 (D. Kan. 2018) ................................28

*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*,
601 F.3d 1159 (11th Cir. 2010) ..............................................................21

*Slocum v. Int'l Paper Co.*,

No. 16-12563, 2019 U.S. Dist. LEXIS 85271 (E.D. La. 2019) ……………………………18

*United Wis. Servs. v. Abbott Labs. (In re Terazosin Hydrochloride Antitrust Litig.)*
220 F.R.D. 672 (S.D. Fla. 2004) ………………………………………………………...18

*Warnell v. Ford Motor Co.*,
189 F.R.D. 383 (N.D. Ill. 1999) …………………………………………………………30

*Whiting v. Jackson State Univ.*,
616 F.2d 116 (5th Cir. 1980) ……………………………………………………… 23

*Williams-Boldware v. Denton County*,
741 F.3d 635 (5th Cir. 2014) ……………………………………………………… 22

*Wilson v. B/E Aerospace, Inc.*,
376 F.3d 1079 (11th Cir. 2004) …………………………………………………… 23

*Zamalloa v. Thompson Landscape Servs. Inc.*,
No. 4:17-CV-00519-ALM-KPJ, 2018 WL 3032677 (E.D. Tex. May 3, 2018) …………... 21

## STATUTES

42 U.S.C. § 1981 ………………………………………………………………1, 14, 22, 23

42 U.S.C. § 2000e *et seq.* ……………………………………………………………..1, 14, 22-24, 29,

## REGULATIONS

8 C.F.R. §§ 214.2(h)(6)(iii)(A) ……………………………………………………… 4

20 CFR § 655.6 ……………………………………………………………………… 5

20 C.F.R. § 655.55 …………………………………………………………………… 6

20 CFR § 655.60 ……………………………………………………………………… 6

## RULES

Fed. R. Civ. P. 23(a) ………………………………………………………………17-18, 20, 24-26

Fed. R. Civ. P. 23(b) ………………………………………………………………1, 17, 19, 26

FED. R. CIV. P. 23(b)(3) ............................................................................ 1, 17, 20, 26-30

FED. R. CIV. P. 23(g) ................................................................................ 1, 25,

## PRELIMINARY STATEMENT

Plaintiffs submit this memorandum in support of their motion to certify a class pursuant to Federal Rule of Civil Procedure 23(b)(3) and appoint class counsel pursuant to Rule 23(g). Plaintiffs seek Rule 23 certification of the second, third, and fourth claims for relief[1] set out in their Second Amended Complaint (Dkt. 93, "Compl."), brought under Louisiana contract law; the Civil Rights Act of 1866, 42 U.S.C. § 1981, ("§ 1981"); and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., ("Title VII"), respectively. Plaintiffs seek Rule 23 certification of a class consisting of: "All Mexican nationals employed through the H-2B program and who worked at the Big Easy Foods plant in Lake Charles, Louisiana, at any time between September 30, 2013 and September 23, 2018."

## I.    FACTUAL BACKGROUND

Plaintiffs and other members of the proposed class are all Hispanic individuals of Mexican descent, and Mexican nationals who lawfully entered the United States as H-2B temporary guest-workers and were employed at Defendant Big Easy Foods of Louisiana, L.L.C., ("Big Easy's") food-processing plant in Lake Charles, Louisiana.[2] Plaintiffs obtained declarations in support of this motion from Class Members who were employed by Defendants and worked at the Lake Charles plant in each year of the time period for which class certification is requested—2013,

---

[1] Plaintiffs' first claim for relief was brought as a collective action pursuant to the Fair Labor Standards Act ("FLSA"), under which certification is governed by 29 U.S.C. § 216(b), rather than Rule 23. The FLSA component of this hybrid litigation was conditionally certified on March 13, 2019. (Doc 30).

[2] Ex. 1, Dec. N. Ramos Vega, at ¶¶ 3, 5; Ex. 2, Dec. Ana Karen Valenzuela, at ¶¶ 3, 5; Ex. 3, Dec. Ana Karen Quiroz, at ¶¶ 3, 5; Ex. 4, Jose Adrian Leyva, at ¶¶ 3, 5; Ex. 5, Jose Abelardo Haro Avitia, at ¶¶ 2, 5; Ex. 6, Dec. Jesus Yamileth Moreno Yucupicio, at ¶¶ 2, 5; Ex. 7, Dec.  Christian Haro Avitia, at ¶¶ 2, 5; Ex. 8, Dec. Edwin Fernando Galaviz Castro, at ¶¶ 2, 4; Ex. 9, Dec. Dulce Viridiana Mora, at ¶¶ 2, 5; Ex. 10, Dec. Citlalic Solis Martinillo, at ¶¶ 2, 5; Ex. 1, Dec. Itzel Torres Zavala, at ¶¶ 2, 5; Ex. 12, Dec. Itzel Torres Zavala, at ¶¶ 2, 5; Ex. 13, Dec.  Karla Galaviz Castro, at ¶¶ 2, 5.

1

2014, 2015, 2016, 2017, and 2018.[3] Plaintiffs and the Class Member declarants were recruited and hired for this work by Defendant Melchor Maya Soto ("Mr. Maya"), who was also their primary and highest-level supervisor throughout the entire putative class period.[4] The other individuals who had a role in supervising Plaintiffs and the Class Member declarants at Big Easy throughout the requested class timeframe were Mario Sanchez and Selene Felix, who are Mr. Maya's stepson and daughter-in-law, and were subordinate to him.[5]

In each relevant year, approximately 40 to 60 other H-2B guestworkers labored alongside Plaintiffs and the Class Member declarants performing food-processing and other production and packing tasks at the Lake Charles plant, all of whom were also Hispanic, of Mexican descent, and Mexican nationals ("Mexican H-2B workers").[6] All of the H-2B workers employed by Big Easy during the relevant period were from Mexico, and most of them knew each other, were related, and were from the same town of Los Mochis, Sinaloa, Mexico. (Maya Depo., Ex. 14 at 49-50; 21:9).

Throughout the relevant period, Big Easy also employed other workers to perform production and packing tasks at the Lake Charles plant who were not of Mexican descent, were not Mexican nationals, and were not H-2B guestworkers ("U.S. workers").[7] The U.S. workers were United States citizens or lawful permanent residents, and based on most of the Plaintiffs' and

---

[3] Ex. 1 at ¶ 5; Ex. 2 at ¶ 5; Ex. 3 at ¶ 5; Ex. 4 at ¶ 5; Ex. 5 at ¶ 5; Ex. 6 at ¶ 5; Ex. 7 at ¶ 5; Ex. 8 at ¶ 4; Ex. 9 at ¶ 5; Ex. 10 at ¶ 5; Ex. 11 at ¶ 5; Ex. 12 at ¶ 5; Ex. 13 at ¶ 5.
[4] Ex. 1 at ¶ 7; Ex. 2 at ¶ 6; Ex. 3 at ¶ 6; Ex. 4 at ¶ 6; Ex. 5 at ¶ 6; Ex. 6 at ¶ 6; Ex. 7 at ¶ 7; Ex. 8 at ¶ 5; Ex. 9 at ¶ 6; Ex. 10 at ¶ 7; Ex. 11 at ¶ 6; Ex. 12 at ¶ 6; Ex. 13 at ¶ 7.
[5] Ex. 1 at ¶ 7; Ex. 2 at ¶ 6; Ex. 3 at ¶ 6; Ex. 4 at ¶ 6; Ex. 5 at ¶ 6; Ex. 6 at ¶ 6; Ex. 7 at ¶ 7; Ex. 8 at ¶ 5; Ex. 9 at ¶ 6; Ex. 10 at ¶ 7; Ex. 11 at ¶ 6; Ex. 12 at ¶ 6; Ex. 13 at ¶ 7.
[6] Ex. 1 at ¶ 8; Ex. 2 at ¶ 7; Ex. 3 at ¶ 7; Ex. 4 at ¶ 7; Ex. 5 at ¶ 7; Ex. 6 at ¶ 7; Ex. 7 at ¶ 8; Ex. 8 at ¶ 6; Ex. 9 at ¶ 7; Ex. 10 at ¶ 8; Ex. 11 at ¶ 7; Ex. 12 at ¶ 7; Ex. 13 at ¶ 8.
[7] Ex. 1 at ¶ 9; Ex. 2 at ¶ 8; Ex. 3 at ¶ 8; Ex. 4 at ¶ 8; Ex. 5 at ¶ 8; Ex. 6 at ¶ 8; Ex. 7 at ¶ 9; Ex. 8 at ¶ 7; Ex. 9 at ¶ 8; Ex. 10 at ¶ 9; Ex. 11 at ¶ 8; Ex. 12 at ¶ 8; Ex. 13 at ¶ 9.

Class Member declarants' observations, they were white and Black.[8]

Big Easy also employed a few former H-2B guestworkers of Mexican national origin who had subsequently immigrated to the United States and become legal permanent residents and/or citizens, including some of Mr. Maya's close family members.[9] The legal permanent residents and/or citizens of Mexican national origin were generally treated worse than the U.S. workers, but overall they were treated better than the Mexican H-2B Workers.[10] Mr. Maya generally gave preferential treatment to his close relatives. (*Id*.).

### a. Defendants systematically abused the temporary H-2B visa program.

Big Easy concentrates on producing and purveying Louisiana specialties including sausage, boudin, stuffed chickens, turkeys, Tur-Duc-Hens, gumbo, jambalaya, and étouffée. Big Easy's brand-name products are primarily manufactured in their 15,000-square-foot USDA-regulated food plant in Lake Charles, Louisiana, and are subsequently sold to supermarkets and distributors across the United States. Compl. at ¶ 8. Big Easy Foods is closely related to a separate employer: Gulf Island Shrimp and Seafood II, L.L.C. ("Gulf Island"), which manages two domestic shrimp-processing plants in Dulac, Louisiana that contribute seafood products to the Big Easy Foods brand. Compl. at ¶ 10. Gulf Island and Big Easy are commonly controlled by managing partners Mark Abraham and Larry Avery. *Id*. In order to find sufficient workers to fill their respective positions at the Lake Charles plant and the Dulac plants, each of the two companies repeatedly petitioned the Department of Homeland Security for permission to import foreign

---

[8] Ex. 1 at ¶ 9; Ex. 2 at ¶ 8; Ex. 3 at ¶ 8; Ex. 4 at ¶ 8; Ex. 5 at ¶ 8; Ex. 6 at ¶ 8; Ex. 7 at ¶ 9; Ex. 8 at ¶ 7; Ex. 10 at ¶ 9; Ex. 11 at ¶ 8.
[9] Ex. 1 at ¶ 10; Ex. 2 at ¶ 9; Ex. 14 at 19:3-22; 40:5-16.
[10] Ex. 1 at ¶ 10; Ex. 2 at ¶ 9.

workers to perform meat-and/or seafood-processing services using H-2B temporary work visas in every year within the classable timeframe. Compl. at ¶¶ 13, 16, 17, 19.

Scott Arrant ("Mr. Arrant"), who was the Chief Operating Officer of both Big Easy and Gulf Island during the relevant period, (Ex. 15, Depo. Big Easy Foods 30(b)(6), at 8:13; 17:5-6), was the main individual within the entities responsible for preparing and filing each company's applications related to the H-2B program. (*Id.* at 80:14-20; 91:13-18; *see also* Exs. 16-20, Labor Certifications for Big Easy Foods for 2013-2017and Exs. 16-19, Labor Certifications for Gulf Island Foods for 2013-2016). Defendant Melchor Maya Soto ("Mr. Maya"), Plant Manager, was the main individual responsible for recruiting H-2B workers for each company. (Ex. 14, Depo. M. Maya, at 48:15-25, 50:1-15, 67:22-23).

By regulation, the Department of Homeland Security requires a petition for H-2B visas to be accompanied by a temporary labor certification from the Department of Labor ("DOL"). 8 C.F.R. §§ 214.2(h)(6)(iii)(A), (C). To obtain such a certification, an employer must request a determination from DOL of the prevailing wage applicable to the employer's job openings and the area of employment. Compl. at ¶ 14. The employer must then engage in specific efforts to recruit U.S. workers at no less than the prevailing wage. *Id.* If the recruitment efforts do not produce sufficient U.S. workers to fill all of the employer's job openings, the employer may submit a temporary labor certification application to DOL on Form 9142. *Id.* The application requires employers to set forth the terms and conditions of work that the employer is offering to the foreign workers it seeks to hire. *Id.* The terms must be no less favorable than the terms offered to U.S. workers and must include a promise to pay no less than the prevailing wage for all hours of work. *Id.* If DOL determines that U.S. workers are not available to fill the employer's job openings, and that the terms and conditions of work offered to foreign workers will not adversely affect the wages

4

and working conditions of similarly employed U.S. workers, DOL approves the labor certification application. *Id.* at ¶ 15. At that point the employer may petition DHS for H-2B visas. *Id.*

The H-2B program only permits employers to temporarily hire migrant workers; the employment must be for a limited period of time—such as a one-time occurrence, or seasonal or intermittent need. 20 CFR § 655.6. However, Defendants abused the H-2B temporary visa program for years in order to provide year-round staffing for Big Easy's plant in Lake Charles. They staggered their supposedly seasonal requests for workers between their applications for Big Easy and Gulf Island such that they would collectively cover the entire year, and Defendants illegally required Mexican H-2B workers who were issued visas to work for Gulf Island in Dulac, Louisiana to instead work for Big Easy in Lake Charles during periods when Big Easy was not authorized to employ H-2B workers. For example:

- Class Member declarant Christian Jovan Haro Avitia was issued a visa to work at Gulf Island in Dulac, Louisiana from November 10, 2014 through February 28, 2015. (Ex. 7 at ¶ 6; Ex. 22). However, when he arrived in the United States, he was taken by Defendants to work for Big Easy in Lake Charles, even though Big easy was not authorized to employ H-2B workers between 12/16/2014 and 2/18/2015 (*See* Exs. 16-19).

- Class Member declarant Karla Veronica Galaviz Castro was issued a visa to work at Gulf Island in Dulac, Louisiana from November 4, 2014 through February 28, 2015 (Ex. 13 at ¶ 6; Ex. 23). However, when she arrived in the United States, she was taken by Defendants to work for Big Easy in Lake Charles for the entirety of her visa's term, even though Big easy was not authorized to employ H-2B workers between 12/16/2014 and 2/18/2015. (*See* Exs. 16-19).

- Class Member declarant Citlalic Solis was issued a visa to work at Gulf Island in Dulac, Louisiana from July 10, 2015 through February 28, 2016. (Ex. 10 at ¶ 6; Ex. 24).However, when she arrived in the United States, she was taken by Defendants to work for Big Easy in Lake Charles for the entirety of her visa's term, even though Big easy was not authorized to employ H-2B workers between 12/16/2015 and 2/13/16. (*See* Exs. 16-19).

- Plaintiff Noe Vega Ramos was issued a visa to work at Gulf Island in Dulac, Louisiana from July 10, 2015 through February 28, 2016. (Ex. 1 at ¶ 6; Ex. 25). However, when he arrived in the United States, he was taken by Defendants to work for Big Easy in

Lake Charles for the entirety of her visa's term, even though Big easy was not authorized to employ H-2B workers 12/16/2015 and 2/13/16. (*See* Exs. 16-19).

Mr. Maya admitted that Big Easy employed Mexican H-2B workers during periods when Big Easy did not have a temporary labor certification authorizing them to employ H-2B workers. Focusing on an exemplary period between December 15, 2015 through February 14, 2016, and after looking through Big Easy's payroll records spanning December 21, 2015 through February 14, 2016 and acknowledging that up to 16 Mexican H-2B workers were laboring at Big Easy's plant throughout that time period (Ex. 14, Depo M. Maya, at 85-88; *see also* Exs. 16-19;  Ex. 25, Plant Log Sheet), Mr. Maya deposed:

> Q: So, would you agree with me that during this gap when H-2 -- when Big Easy Foods was not certified to have H-2B workers at the Lake Charles plant, these H-2B workers were regularly working at the Lake Charles plant?
>
> A: Yes; but -- but I don't know if there's an application that might have been transferred, or -- or an extension of the visa --

(Ex. 14, Depo M. Maya, at 88:12-21). "A temporary labor certification is valid only for the period as approved. . .[and] expires on the last day of authorized employment." 20 CFR § 655.55(a). It is valid solely "for the employer specified on the approved Application for Temporary Employment Certification, [and] may not be transferred from one employer to another unless the employer to which it is transferred is a successor in interest to the employer to which it was issued." 20 CFR § 655.55(b). Employers may apply for extensions of the period of employment only if they can show their need is related to unforeseeable conditions such as weather or other factors beyond their control—and even if they can make such a showing, the DOL will not grant such extensions absent extraordinary circumstances where the original certified period and the extended time frame would exceed 9 months in the aggregate. 20 CFR § 655.60. Despite targeted discovery on this subject, Defendants could not produce any record of a transfer or extension that would have rendered their

conduct permissible. Defendants flouted the H-2B program's requirements, treating Plaintiffs and Class Members as a captive, fungible workforce exploitable for their business interests without regard to the laborers' dignity nor the representations Mr. Arrant and Mr. Maya made to them and the government regarding their employment.

**b. Defendants discriminatorily, and in breach of contract, required the Mexican H-2B workers—but not the U.S. workers--to work numerous hours each workweek for which they were not compensated, and made illegal deductions further reducing their pay.**

Plaintiffs allege that Defendants entered into valid, enforceable employment contracts with each Mexican H-2B worker, into which were incorporated the DOL-approved temporary labor certifications for each worker's H-2B visas (ETA Form 9142 or ETA Form 9142B), the accompanying attestations, and the applicable regulatory requirements. Compl. at ¶ 77. Each Mexican H-2B worker's employment contract contained the same enforceable terms and conditions of employment, including an enforceable guarantee of wages no less than the H-2B prevailing wages—which is a promise Big Easy was required to make in order to be approved for the H-2B temporary visa program. *Id*.; (*see also* Ex. 15, Depo. Big Easy Foods 30(b)(6), at 31:11-20, emphasizing that for all Mexican H-2B workers, Big Easy agreed to pay *at least* the prevailing wage rate). Plaintiffs allege that Defendants systematically breached these contracts by failing to pay them and similarly situated H-2B workers the promised wage rate for all hours worked. Compl. at ¶ 77. Big Easy in fact generally promised each H-2B worker an hourly wage that was slightly higher than the prevailing wage applicable in each season.[11] The exact contractually promised

---

[11] Ex. 1 at ¶ 11; Ex. 2 at ¶ 10; Ex. 3 at ¶ 9; Ex. 4 at ¶ 9; Ex. 5 at ¶ 9; Ex. 6 at ¶ 9; Ex. 7 at ¶ 10; Ex. 8 at ¶ 8; Ex. 9 at ¶ 9; Ex. 10 at ¶ 11; Ex. 11 at ¶ 9; Ex. 12 at ¶ 9; Ex. 13 at ¶ 10; *see also* Exs. 16-19.

wage rates are printed on the face of each pay statement Big Easy produced for each H-2B worker throughout the relevant period.[12]

In spite of these promises, throughout all relevant years Big Easy repeatedly failed to pay the Mexican H-2B workers for all of the hours they actually worked.[13] Consistently throughout their employment, the Mexican H-2B workers regularly worked more hours each pay period than were recorded on their paychecks and paid for by Big Easy. *Id.* Big Easy also made unreasonable deductions from the Mexican H-2B workers' paychecks which further reduced their pay below the prevailing and contractual rates; including, e.g., to reimburse Defendants for costs related to the visas, the Mexican H-2B workers' travel to the United States, and for Big Easy's crowded housing.[14]

In a glaring example of their discriminatory disparate treatment of the Mexican H-2B workers, Big Easy had a timeclock system throughout the entire requested class period, but only allowed U.S. workers to use it.[15] U.S. workers' time was accurately recorded, and they were not required to labor after-hours off-the-clock. (Ex. 15, Depo. Big Easy Foods 30(b)(6), at 232:7-17[16]).

---

[12] Ex. 1 at ¶ 11; Ex. 2 at ¶ 10; Ex. 3 at ¶ 9; Ex. 4 at ¶ 9; Ex. 5 at ¶ 9; Ex. 6 at ¶ 9; Ex. 7 at ¶ 10; Ex. 8 at ¶ 8; Ex. 9 at ¶ 9; Ex. 10 at ¶ 11; Ex. 11 at ¶ 9; Ex. 12 at ¶ 9; Ex. 13 at ¶ 10.

[13] Ex. 1 at ¶ 12; Ex. 2 at ¶ 11; Ex. 3 at ¶ 10; Ex. 4 at ¶ 10; Ex. 5 at ¶ 10; Ex. 6 at ¶ 10; Ex. 7 at ¶ 11; Ex. 8 at ¶ 9; Ex. 9 at ¶ 10; Ex. 10 at ¶ 13; Ex. 11 at ¶ 10; Ex. 12 at ¶ 10; Ex. 13 at ¶ 11.

[14] Ex. 1 at ¶¶ 17, 27; Ex. 2 at ¶¶ 12, 23; Ex. 3 at ¶¶ 11, 19; Ex. 4 at ¶¶ 11, 20; Ex. 5 at ¶¶ 11, 22; Ex. 6 at ¶¶ 11, 20; Ex. 7 at ¶¶ 12, 19; Ex. 8 at ¶¶ 10, 18; Ex. 9 at ¶¶ 11, 19; Ex. 10 at ¶ 17; Ex. 11 at ¶¶ 11, 19; Ex. 12 at ¶¶11, 19; Ex. 13 at ¶¶ 12, 21.

[15] Ex. 1 at ¶ 17; Ex. 2 at ¶ 16; Ex. 3 at ¶ 14; Ex. 4 at ¶ 15; Ex. 5 at ¶ 14; Ex. 6 at ¶ 14; Ex. 7 at ¶ 14; Ex. 8 at ¶ 13; Ex. 9 at ¶ 13; Ex. 10 at ¶ 12; Ex. 11 at ¶ 14; Ex. 12 at ¶ 13; Ex. 13 at ¶ 15; *See also* Ex. 15, Depo. Big Easy Foods 30(b)(6), at 229:11-20.

[16] *Q.* Was there anyone who was paid using the day rate methodology who was never an H-2B worker? *A.* No. *Q.* So the remainder of the Lake Charles production plant workers, how were they paid? How was their pay calculated? *A.* With a time clock. *Q.* So they were paid based on their actual hours worked and for hours in excess of 40, time and a half of their regular rate? *A.* (Nods head affirmatively.)

Defendants have admitted that, throughout all of the relevant years, they compensated the H-2B workers not on the basis of their actual hours worked, but rather used formulas in Microsoft Excel to back into the fictitious hours represented on their pay stubs. (*E.g.*, Ex. 25, Plant Log Sheet Sample). 30(b)(6) designee David Ieyoub is the individual who calculated the Mexican H-2B workers' pay for each two-week period by multiplying the number of "production days" they worked in a workweek (information supplied by Mr. Maya) times 8 hours, times their respective promised hourly wage—in other words, he paid them at straight time (with no overtime premium), of the product of an assumed 8 hours worked per shift and the number of shifts Mr. Maya credited to them. (Ex. 15, Depo. Big Easy Foods 30(b)(6), at 213:1-25, 214:1-3)[17] Mr. Ieyoub then used a formula to back into the fabricated "regular" and "overtime" hours that ended up printed on the pay statements:

> Q. But it's not based on the actual hours worked by the H-2B workers?
> A. I couldn't answer to that.
> Q. Isn't it -- is there a way that answer could be yes?
> A. Well, I'm saying I can't answer to know because I wasn't there to know that.
> Q. Right. So I'm saying you're backing into the hours. That's what this shows. These calculations are not based on any record of actual hours worked by the plaintiffs; is that correct?
> A. Correct.

---

[17] *Q.* I'm sorry. You said the salary is the -- *A.* Number of days production multiplied by the base per day. *Q.* Do you know how the base per day was calculated? *A.* So the combination of the prevailing rate is the 10.2 times 8 hours. So 81.60 divided by 8 is your $10.20. *Q.* So you think it's their pay rate times eight hours. Do you always use the value of eight hours? *A.* Yes. *Q.* And why did you use eight hours? *A.* Because eight hours is the standard day over two weeks. Get the 80 hours per week. *Q.* But that doesn't take into account at all how much they actually may have worked on any given day? *A.* No. I mean, I cannot answer to that. *Q.* As far as you know, was anyone at Big Easy at that time maintaining any record of actual hours worked by the H-2B Visa workers? *A.* Well, what [Mr. Maya] is putting down is equivalent to what their actual hours were worked. *Q.* How do you figure? *A.* Well, I mean, like you said, you're being paid 80 hours plus on average 23 to 26 hours of overtime. *Q.* But isn't it possible they worked more than eight hours a day? *A.* Anything is possible. But I would say that this is probably being consistent with hours worked per day.

(*Id.* at 217:24-25, 218:1-9). The record reflects that it was patently unreasonable for Mr. Ieyoub to assume that the Mexican H-2B workers worked 8 hours per production day, and to compensate them at straight-time for the product of those values. As Mr. Arrant testified explicitly, in a typical shift the Mexican H-2B workers "normally don't work just eight hours. They work 10, maybe 11 hours." (*Id.* at 155:22-23). The Mexican H-2B workers regularly started each workday at 7:00 a.m., and occasionally earlier. Although the shifts nominally ended at 4:00 p.m. and the U.S. workers were usually free to leave at that time, there was no fixed end time in practice for the Mexican H-2B workers.[18] Throughout the relevant timeframe, the Mexican H-2B workers commonly ended their workdays Monday through Friday between 5:30 p.m. and 7:00 p.m., and they regularly worked until later. *Id.* On weekday shifts, the Mexican H-2B workers usually had one break of about an hour for lunch. Throughout the relevant time frame, the Mexican H-2B workers also performed work on multiple Saturdays and Sundays, generally starting at 7:00 a.m. and working through the afternoon—and sometimes through the evening—without a break. *Id.* They usually worked most Saturdays, and additionally worked on Sundays about twice per month. The Mexican H-2B workers were also at times forced to return to the plant to continue working after it was closed for the day and well after the USDA inspector was no longer onsite; the U.S. workers were never required to do this.[19]

Mr. Maya testified that the plant's operations relied heavily on the H-2B workers (Ex. 14, Depo M. Maya, at 43:7-8), that their typical starting time was 7:00 a.m., and that their leaving depended on the production demands—and could be close to 7:00 p.m. at least sometimes (*Id.* at

---

[18] Ex. 1 at ¶ 15; Ex. 2 at ¶ 14; Ex. 3 at ¶ 12; Ex. 4 at ¶ 13; Ex. 5 at ¶ 12; Ex. 6 at ¶ 12; Ex. 7 at ¶ 13; Ex. 8 at ¶ 11; Ex. 9 at ¶ 12; Ex. 10 at ¶ 11; Ex. 11 at ¶ 12; Ex. 12 at ¶ 12; Ex. 13 at ¶ 14.
[19] Ex. 1 at ¶ 16; Ex. 2 at ¶ 15; Ex. 3 at ¶ 13; Ex. 4 at ¶ 14; Ex. 5 at ¶ 13; Ex. 6 at ¶ 13; Ex. 8 at ¶ 12; Ex. 11 at ¶ 13; Ex. 12 at ¶ 12; Ex. 13 at ¶ 14.

29:6-30:12). He further admitted that the Mexican H-2B workers labored on the weekends, including at least sometimes on Sundays—and that this was often doing work such as cleaning that did not require the presence of the USDA inspector. (*Id.* at 149:1-150:2; 153:2-154:7). He also acknowledged that production workers, including the Mexican H-2B workers, at least sometimes returned to the plant in the evenings after hours to do non-production cleaning work—and that such was true throughout each year in the relevant period. (*Id.* at 157:1-161:4).

Mr. Arrant testified that it was common for the Mexican H-2B workers to work substantial overtime hours per pay period, and that—although she was not always at the plant throughout the Mexican H-2B workers' entire shifts—they were often doing so together with the USDA inspector, who had a regular nominal 8-hour shift but would work a significant number of overtime hours. (Ex. 15, Depo. Big Easy Foods (30(b)(6), at 155:13-157:24). He clarified that she generally worked fewer hours in total than the H-2B workers, because she made her own hours, and would sometimes not arrive first thing in the morning but rather an hour after the H-2B workers' regular shift had started—she was not at the plant the entire time it operated on a daily basis. (*Id.* at 147:24-148:9). He also clarified that there were some tasks, such as seafood production, that H-2B workers did sometimes for entire shifts when she was not onsite. (*Id.* at 160:16-24). Although she worked fewer hours than the Mexican H-2B workers, "we pay her a lot of overtime too . . .and it coincides with what the [Mexican H-2B] employees make." (*Id.* at 157:23-24).

The government was responsible for compensating the USDA inspector's hours worked up to 40 each week, but Big Easy had to pay for her overtime hours. (Ex. 15 at 162:2-15). In order to seek reimbursement, she was required to submit a form wherein she had recorded her total full and quarter daily overtime hours worked for Mr. Maya's approval. Defendants produced sparse examples of these records, and have stated that they lack a complete set. Despite the fact that it is

admitted that the USDA inspector worked fewer hours overall than the Mexican H-2B workers and was generally not at the plant the whole time it was operating on any given day, the existing records suggest that she was often paid for significantly more overtime hours than the Mexican H-2B workers. To illustrate, Plaintiffs' counsel prepared a demonstrative sample showing the total overtime hours the USDA inspector was compensated on dates lining up with three consecutive Big Easy pay periods during which the USDA was compensated for more overtime hours than *every* employee on Big Easy's payroll. Ex. 31, (including the underlying USDA records used):

- For the dates the inspector worked during Big Easy's pay period ending on 5/10/2015, she was compensated for 41.25 overtime hours. Most H-2B workers were only compensated for 32 overtime hours (or fewer) for this pay period, and the highest anyone on Big Easy's payroll earned for that pay period was 36.68 overtime hours, which was paid to a couple Mr. Maya's relatives. (*Id.*; Ex. 27, Big Easy's 2015 Payroll Register Excerpts, Ex. 27 at BE001711-1716).

- For the dates the inspector worked during Big Easy's pay period ending on 5/24/2015, she was compensated for 44 overtime hours. Most H-2B workers were only compensated for 32 overtime hours (or fewer) for this pay period, and the highest anyone on Big Easy's payroll earned for that pay period was 37.33 overtime hours, which was paid to a only a few workers, including Mr. Maya's relatives. (*Id.*;  Ex. 27 at BE001718-1725).

- For the dates the inspector worked during Big Easy's pay period ending on 6/7/2015, she was compensated for 25 overtime hours. The highest anyone on Big Easy's payroll earned for that pay period was 10.67 overtime hours, which was paid to numerous Mexican H-2B workers. (*Id.*; Ex. 27 at BE001726-1732).

Big Easy's discriminatory system for compensating the Mexican H-2B workers regularly shorted them between an average of 10 to 20 hours per pay period—or more—which were completely uncompensated.[20] To illustrate this concretely, Named Plaintiff Noe Vega Ramos decided in September 2016 to use the Notes App on his phone to make a contemporaneous record

---

[20] Ex. 1 at ¶ 18; Ex. 2 at ¶ 17; Ex. 3 at ¶ 15; Ex. 4 at ¶ 16; Ex. 5 at ¶ 15; Ex. 6 at ¶ 15; Ex. 7 at ¶ 15; Ex. 8 at ¶ 14; Ex. 9 at ¶ 14; Ex. 10 at ¶ 13; Ex. 11 at ¶ 15; Ex. 12 at ¶ 14; Ex. 13 at ¶ 16.

of his actual hours worked, including the daily starting and stopping times of his initial workday—as well as notations of any time he and other H-2B workers were required to return to the plant in the evenings after hours—to compare to the fictitiously-low hours that appeared on his and other Mexican H-2B workers' paychecks.[21] He started taking these notes on Tuesday, September 6, 2016, and ending on Tuesday, October 11, 2016, though he also worked on Monday, September 5, 2016 and Wednesday, October 12, 2016 (which to the best of his recollection was his final day of work for Big Easy).[22] After the Mexican H-2B workers received their paychecks for the period covering September 12, 2016 through September 25, 2016, Noe and Named Plaintiff Ana Karen Valenzuela used the original notes on Noe's phone to create a handwritten summary of the hours worked throughout that entire pay period, and Noe took a photograph of it next to Noe's paycheck.[23] Noe confirms that the factual information contained in Attachment C—which the Plaintiffs' counsel gleaned from the information reflected in Attachment A and Attachment B, and Noe's reasonable recollections described in paragraphs 19 - 21 of his declaration—is true and correct to the best of his reasonable recollection.[24] Noe also took a few photographs documenting that he and other Mexican H-2B workers were performing labor at Big Easy's plant at 7:45 p.m. on Friday, September 30, 2016, and at 1:50 p.m. and 2:54 p.m. on Sunday, October 2, 2016.[25]

Using Attachment C to Noe's declaration and payroll information produced by Defendants, Plaintiffs' counsel calculated the difference between the hours he worked and the hours he was compensated within the full two-week pay periods captured by his own contemporaneous timekeeping. (Ex. 30). These calculations show 15.17 completely uncompensated hours worked

---

[21] Ex. 1 at ¶¶ 19 – 20; Ex. 2 at ¶¶ 18 – 19.
[22] *Id.* at ¶ 21.
[23] *Id.* at ¶ 20; *see also* Attachment B to Ex. 1; Ex. 2 at ¶ 19.
[24] *Id.* at ¶ 22.
[25] *Id.* at ¶ 23; *see also* Attachment D to Ex. 1.

in the pay period ending on 9/25/16, 27.6 completely uncompensated hours worked in the pay period ending on 10/9/16, and 4.7 completely uncompensated hours for his last three days of work.

Class Member declarants Lilia Isai Moreno Yucupicio and Karla Veronica Galaviz Castro worked at Big Easy seasonally throughout nearly the entirety of the proposed class period.[26] They each declare from their direct personal experience that conditions were consistent throughout all of their years at the plant, and did not start to change for the better for the Mexican H-2B workers until approximately September 24, 2018.[27] On that day, the H-2B workers were finally allowed to start clocking in and out using a timeclock system, and for the first time in their employment, Big Easy began to accurately record their time and pay them for all hours that actually worked. (*Id.*) After that time, Mr. Maya also started to behave in a manner that was more respectful and less intimidating towards the Mexican H-2B workers. (*Id.*). The Class Member declarants believed that these changes were in response to this litigation and the claims brought by the Named Plaintiffs on behalf of the putative class. (*Id.*).

      **c. Defendants imposed upon Plaintiffs and class members discriminatory job-related requirements and adverse terms and conditions of employment to which U.S. employees were not subjected, and exposed the H-2B workers to an objectively hostile and abusive work environment on account of their race, national origin, and/or alienage.**

Plaintiffs allege that Defendants systematically violated Title VII and/or § 1981 by, on the basis of their race, national origin, and/or alienage: (a) imposing discriminatory job-related requirements and adverse terms and conditions of employment on the Mexican H-2B workers to which the U.S. workers were not similarly subjected; (b) subjecting the Mexican H-2B workers to discriminatory and offensive treatment that was sufficiently severe that it created a hostile work

---

[26] Ex. 12 at ¶ 5; Ex. 13 at ¶ 5.
[27] Ex. 12 at ¶ 21; Ex. 13 at ¶ 23.

14

environment; and (c) carrying out their discriminatory practices with malice or reckless disregard for Plaintiffs' and other H-2B workers' statutorily protected rights. (Compl. ¶ 82-87).

Mr. Maya was completely in charge of the Mexican H-2B workers, and had the unilateral power to fire the workers, send them back to Mexico, or decide whether they would return in future years.[28] Mr. Maya abused this power and imposed discriminatory requirements and conditions on the Mexican H-2B workers. (*Id.*) Further, Big Easy did not provide the Mexican H-2B workers with a mechanism to make complaints about Mr. Maya.[29] The Mexican H-2B workers were not informed of a company policy against discrimination or harassment, and were not provided instructions or contact information to make complaints about mistreatment at work. *(Id.)* The Mexican H-2B workers were usually physically separated from the U.S. workers, and the U.S. workers were assigned easier, less labor-intensive work, and given more breaks even though they worked fewer hours than the Mexican H-2B workers.[30] When Mr. Maya interacted with the Mexican H-2B workers, he was abusive and threatening, whereas he was more respectful and mild-mannered when addressing the U.S. workers. (*Id.*) On a nearly daily basis, Mr. Maya yelled at and threatened the Mexican H-2B workers when they worked, and insulted the workers describing them as useless and stupid, and even threatened to have the Mexican H-2B workers deported. (*Id.*)

In approximately December 2014, Mexican H-2B worker Christian Jovan Haro Avitia, after receiving his second paycheck, complained to Mr. Maya that the Mexican H-2B workers were not being paid for all for the hours they worked. Mr. Maya responded by cursing at him and

---

[28] Ex. 1 at ¶ 24; Ex. 2 at ¶ 20; Ex. 3 at ¶ 16; Ex. 4 at ¶ 17; Ex. 5 at ¶ 20; Ex. 6 at ¶ 17; Ex. 8 at ¶ 15; Ex. 9 at ¶ 16; Ex. 10 at ¶ 14; Ex. 11 at ¶ 16; Ex. 12 at ¶ 16; Ex. 13 at ¶ 18.

[29] Ex. 1 at ¶ 25; Ex. 2 at ¶ 21; Ex. 3 at ¶ 17; Ex. 4 at ¶ 18; Ex. 5 at ¶ 19; Ex. 6 at ¶ 18; Ex. 8 at ¶ 16 ; Ex. 9 at ¶ 17; Ex. 10 at ¶ 15; Ex. 11 at ¶ 17; Ex. 12 at ¶ 17; Ex. 13 at ¶ 19.

[30] Ex. 1 at ¶ 26; Ex. 2 at ¶ 22; Ex. 3 at ¶ 18; Ex. 4 at ¶ 19; Ex. 5 at ¶ 21; Ex. 6 at ¶ 19; Ex. 7 at ¶ 17; Ex. 8 at ¶ 17; Ex. 9 at ¶ 18; Ex. 10 at ¶ 16; Ex. 11 at ¶ 18; Ex. 12 at ¶ 18; Ex. 13 at ¶ 20.

threatening him. Mr. Maya then terminated his employment and evicted him from the housing.[31] After Christian Jovan Haro Avitia was terminated, other Mexican H-2B workers were scared to complain to Mr. Maya.[32]

Mr. Maya also regularly harassed the female Mexican H-2B workers and treated them like property, and referred to them using terms like prostitutes.[33] He made sexual comments in Spanish in front of the Mexican H-2B workers. (*Id.*) If workers did not flirt back to Mr. Maya, they were treated worse.[34] Mr. Maya inappropriately touched female Mexican H-2B workers while they were working.[35]

Mr. Maya also harassed the Mexican H-2B workers by unreasonably interfering with their privacy and personal lives outside of the plant; the U.S. workers were not subjected to the same treatment.[36] Mr. Maya assigned the Mexican H-2B workers to crowded housing segregated by gender, for which deductions were made from their paychecks. (*Id.*).  Mr. Maya instructed the Mexican H-2B workers that they could not have visitors at the house and that the male and female Mexican H-2B workers could not visit each other's houses during their free time. (*Id.*). To reasonably travel around town, the Mexican H-2B workers needed to use the Big Easy Foods van, but they could only make trips if Mr. Maya approved them. The Mexican H-2B workers were required to ask for permission to go places during their spare time and were under instructions to not leave the housing late at night during their free time. (*Id.*).  If Mr. Maya learned that a Mexican

---

[31] Ex.7 at ¶ 17; ¶ Ex. 6 at ¶ 14; Ex. 5 at ¶ 17.
[32] Ex. 6 at ¶ 14; Ex. 5 at ¶ 17; Ex. 13 at ¶ 17.
[33] Ex. 4 at ¶ 19; Ex. 10 at ¶ 10; Ex. 12 at ¶ 18.
[34] Ex. 9 at ¶ 18.
[35] Ex. 2 at ¶ 22; Ex. 3 at ¶ 18; Ex. 9 at ¶ 18.
[36] Ex. 1 at ¶ 27; Ex. 2 at ¶ 23; Ex. 3 at ¶ 19; Ex. 4 at ¶ 20; Ex. 5 at ¶ 22; Ex. 6 at ¶ 20; Ex. 7 at ¶ 20; Ex. 8 at ¶ 18; Ex. 9 at ¶ 19; Ex. 10 at ¶ 17; Ex. 11 at ¶ 19; Ex. 12 at ¶ 19; Ex. 13 at ¶ 21.

H-2B worker went out without his permission, he would call that person into his office at the plant in front of the other Mexican H-2B workers. (*Id.*).

## II.    LEGAL STANDARD

For all Rule 23 class actions, a party seeking certification must show that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a). The lawsuit must then meet one of the criteria found in Rule 23(b). FED. R. CIV. P. 23(b). Here, the relevant provision is Rule 23(b)(3), which allows a class action to be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

The purpose of class actions is to conserve "the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 155 (1982). "In determining the propriety of a class action, the question is not whether . . . the plaintiffs have stated a cause of action or will prevail on the merits, but whether the requirements of Federal Rules of Civil Procedure 23 are met." *Floyd v. Bowen*, 833 F.2d 529, 534 (5th Cir. 1987) (quoting *Miller v. Mackey International, Inc.*, 452 F.2d 424, 427 (5th Cir. 1971)).

## III.    ARGUMENT

### a.    The requirements of Rule 23(a) are each satisfied.

#### 1.    The Class clearly meets the numerosity standard.

17

Rule 23(a)(1) is satisfied when "the class is so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). "Impracticability, however, does not mean impossibility." *United Wis. Servs. v. Abbott Labs. (In re Terazosin Hydrochloride Antitrust Litig.)*, 220 F.R.D. 672, 684 (S.D. Fla. 2004). Further, while the size of the class is highly relevant, "[t]he numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. v. EEOC*, 446 U.S. 318, 330 (1980). Nevertheless, the Fifth Circuit has cited with approval Newberg's treatise, which "suggest[s] that any class consisting of more than forty member[s] 'should raise a presumption that joinder is impracticable.'" *Slocum v. Int'l Paper Co.*, No. 16-12563, 2019 U.S. Dist. LEXIS 85271, at *10 (E.D. La. 2019) (first alteration in original) (quoting *Mullen v. Treasure Chest Casino LLC*, 186 F.3d 620, 624 (5th Cir. 1999)).

In this case, although the precise size of the class is known only to Defendants at this time, the class demonstrably exceeds 107 class members, and is almost certainly less than 200 class members. (Ex. 26, H-2B Census, a list produced by Defendants which includes all Mexican H-2B workers[37] who labored for Big Easy in Lake Charles between 2015-2019). Because numerous workers labored for the plant for more than one season, the list includes some—but presumably not all—of the Mexican H-2B workers who were employed by Big Easy during the 2013 and 2014 periods covered by the proposed class definition). Courts routinely hold joinder to be impracticable when the class is smaller than the putative class here. *E.g. Mullen*, 186 F.3d at 624; *Gutierrez v. LVNV Funding, LLC*, No. EP-08-cv-225, 2009 U.S. Dist. LEXIS 54479, at *9 (W.D. Tex. Mar. 16, 2009) (23(a)(1) satisfied by showing of 39 known class members and an estimated 100 potential class members).

---

[37] Although the list shows 111 workers, a few of them were not in fact H-2B workers during the relevant period (including, e.g. Defendant Melchor Maya Soto).

Additional factors supporting a finding of impracticability of joinder in this matter include that the potential class members are internationally geographically dispersed,[38] have limited education, have no-to-limited proficiency with the English language,[39] and lack financial familiarity with the U.S. court system[40] as well as the financial resources to litigate independently of this action.[41] *See Ibe v. Jones*, 836 F.3d 516, 528 (5th Cir. 2016) (identifying geographical dispersion as a factor to consider when evaluating numerosity); *Recinos-Recinos v. Express Forestry, Inc.*, 233 F.R.D. 472, 478 (E.D. La. 2006) ("[M]any putative class members may not be fluent in the English language. This increases the impracticability of each individual bringing his claim personally before the Court and weighs in favor of certification."), *Moodie v. Kiawah Island Inn Co., LLC*, 309 F.R.D. 370, 377 (D.S.C. 2015) ("The proposed class members are temporary foreign workers who permanently reside in a foreign country, likely lack financial resources, lack familiarity with the U.S. court system and have relatively small claims. . . . Due to these factors, joinder of all members of the class is impractical."); *Covarrubias v. Capt. Charlie's Seafood, Inc.*, 2011 U.S. Dist. LEXIS 72636, *10–11 (E.D.N.C. 2011) ("Where, as here, class members are geographically dispersed, lack sophistication, and are non-English-speaking migrant workers, courts have found that these additional factors make joinder impracticable."); *Casilao v. Hotelmacher LLC*, No. CIV-17-800-SLP, 2021 U.S. Dist. LEXIS 188177, at *11 (W.D. Okla. Sep. 30, 2021) (Characteristics of the H-2B worker class members including their geographic

---

[38] Ex. 1 at ¶ 2, Ex. 2 at ¶ 2, Ex. 3 at ¶ 2, Ex. 4 at ¶ 2, Ex. 5 at ¶ 3, Ex. 6 at ¶ 3, Ex. 7 at ¶ 3, Ex. 9 at ¶ 3, Ex. 10 at ¶ 3, Ex. 11 at ¶ 3, Ex. 12 at ¶ 3, Ex. 13 at ¶ 3.
[39] Ex. 1 at ¶ 4, Ex. 2 at ¶ 4, Ex. 3 at ¶ 4, Ex. 4 at ¶ 4, Ex. 5 at ¶ 4, Ex. 6 at ¶ 4, Ex. 7 at ¶ 4, Ex. 8 at ¶ 3, Ex. 9 at ¶ 4, Ex. 10 at ¶ 4, Ex. 11 at ¶ 4, Ex. 12 at ¶ 4, Ex. 13 at ¶ 4.
[40] *Id*.
[41] Ex. 1 at ¶ 31, Ex. 2 at ¶ 25, Ex. 3 at ¶ 22, Ex. 4 at ¶ 23, Ex. 5 at ¶ 27.

dispersion, lack of financial resources, and lack of familiarity with the English language and the U.S. court system "are a proper matter of inquiry in determining whether joinder is practicable."). With over 100 temporary foreign workers employed by defendants during the relevant time period, all of whom lack financial resources, lack familiarity with the U.S. judicial system, and have minimal English-language skills, numerosity is not legitimately contestable in this case.

### 2.  There are multiple common issues of fact and law.

The proposed class also satisfies the commonality requirement, which requires that "class members must raise at least one contention that is central to the validity of each class member's claims." *In re Deepwater Horizon*, 739 F.3d 790, 810 (5th Cir. 2014). *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 325 (5th Cir. 2008) ("Since the thresholds for commonality and typicality under Rule 23(a) are not high . . . [the court] will assume that Rule 23(a) is satisfied and turn to evaluate the parties' arguments against the more exacting demands of Rule 23(b)(3)."

To succeed on their breach of contract claim, Plaintiffs must satisfy three "essential" elements of a Louisiana breach of contract claim: "(1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the obligee." *IberiaBank v. Broussard*, 907 F.3d 826, 835 (5th Cir. 2018) (quoting *Favrot v. Favrot*, 68 So. 3d 1099, 1108-09 (La. App. 4 Cir. 2011)). Common issues of fact and law central to this claim include:

a.  Whether the Mexican H-2B workers had valid, enforceable employment contracts with Big Easy;

b.  Whether such contracts contained the same enforceable terms and conditions of employment, including an enforceable guarantee of at least H-2B prevailing wages;

c.  Whether the Mexican H-2B workers worked uncompensated hours which brought their wages below the applicable prevailing wages and/or the promised wages shown on the face of Plaintiffs' pay statements;

> d. Whether the terms of these common employment contracts were violated when Defendants failed to pay the promised rate for all hours worked and made further deductions from Plaintiffs' paychecks.

Regardless of the specific wage amounts paid to individual class members—which are readily discernible from the records kept by Defendants in the ordinary course of business—these questions are "central to the validity of each one of the claims." *Moodie*, 309 F.R.D. at 377. Further, because Plaintiffs allege that the class members' employment contracts included the terms and conditions set forth in the Form 9142 labor certification applications,[42] "this case presents the quintessential contract claim for class-wide treatment." *Bowe v. Pub. Storage*, 318 F.R.D. 160, 183 (S.D. Fla. 2015). As the Eleventh Circuit stated in S*acred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, "It is the form contract, executed under like conditions by all class members, that best facilitates class treatment." 601 F.3d 1159, 1171 (11th Cir. 2010); *see also Kolbe v. BAC Home Loans Serv., LP*, 738 F.3d 432, 441 (1st Cir. 2013) (noting that courts have certified classes for contract disputes over form contracts "because the form contracts are

---

[42] Numerous courts have allowed H-2B workers to advance a breach of contract claim based on the same contractual theory as that advanced by Plaintiffs. *See, e.g., Cuellar–Aguilar v. Deggeller Attractions, Inc.*, 812 F.3d 614, 620 (8th Cir. 2015) ("Like a minimum-wage law, the Department of Labor regulations imposed upon [defendant] a legal obligation to pay its H–2B employees no less than the prevailing wage. In light of this legal duty, we hold that the terms of the labor certification applications, including the agreement to pay the prevailing wage . . . form a part of the workers' contracts."); *Aviles-Cervantes v. Outside Unlimited, Inc.*, 276 F. Supp. 3d 480, 494-495 (D. Md. 2017) (denying defendants' motion to dismiss breach of contract claim on grounds of lack of consideration as to their obligations to comply with H-2B regulations and terms of H-2B certifications); *Moodie v. Kiawah Island Inn Co., LLC*, 124 F.Supp.3d 711, 725–28 (D. S.C. 2015) (finding law and regulations applicable to the H-2B program were part of employment contract and denying motion to dismiss similar state law breach of contract claims by H–2B workers); *Zamalloa v. Thompson Landscape Servs. Inc.*, No. 4:17-CV-00519-ALM-KPJ, 2018 WL 3032677 at *5 (E.D. Tex. May 3, 2018) (unpublished op.) (denying motion to dismiss state law breach of contract claim and finding contracts with plaintiffs under the H-2B visa program "explicitly and/or by operation of law included the terms and conditions set forth in the certification application, including Defendants' promise to pay Plaintiffs no less than the prevailing wages for all hours.")

interpreted uniformly across members of the class, and thus the outcome does not depend on extrinsic evidence that would be different for each putative class member"); *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1260-61 (11th Cir. 2003) (affirming class certification for breach of contract claim where the contracts were materially similar and defendant had acted the same with respect to the entire class); *Kase v. Salomon Smith Barney, Inc.*, 218 F.R.D. 149, 155 (S.D. Tex. 2003) ("An action primarily involving interpretation of a form contract is well suited for class adjudication").

To establish their hostile work environment claim under Title VII and Section 1981, the members must show that they:

> (1) belong[] to a protected group; (2) w[ere] subjected to unwelcome harassment; (3) the harassment complained of was based on [their protected characteristic(s)]; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.[43]

*Williams-Boldware v. Denton County*, 741 F.3d 635, 640 (5th Cir. 2014) (quoting *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012)). The Supreme Court has explained that the fourth element is satisfied "when the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). "For harassment to be sufficiently severe or pervasive to alter the conditions of the victim's employment, the conduct complained of must be both objectively and subjectively offensive." *EEOC v. WC&M Enters.*, 496 F.3d 393, 399 (5th Cir. 2007) (citing *Harris*, 510 U.S. at 21–22. "To determine whether the victim's work environment was objectively offensive, courts consider

---

[43] The fifth element is satisfied where, as here, the claim of harassment is against a supervisor. *Lauderdale v. Tex. Dep't of Criminal Justice*, 512 F.3d 157, 162–63 (5th Cir. 2007).

the totality of the circumstances, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an employee's work performance." *Id.*

To succeed on the disparate treatment claim, they must demonstrate that: (1) they are qualified members of a protected class and (2) they were subjected to an adverse employment action in contrast with similarly-situated employees outside of the protected class. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004); *see also Whiting v. Jackson State Univ.*, 616 F.2d 116, 121 (5th Cir. 1980) (elements of a disparate treatment claim under § 1981 and Title VII are identical).

Common issues of fact and law central to the discrimination claims include:

a.  Whether the work environment at the Lake Charles plant was characterized by harassment based on the Mexican H-2B workers' shared race, national origin, and/or alienage;

b.  Whether such harassment was severe or pervasive;

c.  Whether Plaintiffs and other class members were subjected to discriminatory job-related requirements and adverse terms and conditions of employment, to which non-Hispanic and/or U.S. citizen employees were not similarly subjected, including discriminatory pay practices;

d.  Whether Defendant Big Easy Foods is responsible for discriminatory treatment;

e.  Whether Defendant's admitted disparate treatment with respect to the manner in which the Mexican H-2B workers' time was kept and they were paid resulted in discriminatory off-the-clock time.

The pattern of discriminatory treatment testified to by the Named Plaintiffs and Class Member declarants was perpetrated by a single manager, at a single jobsite, where it occurred openly on a daily basis in front of all putative class members, throughout the entirety of the five-year period at issue in this litigation. As they held the same job, at the same jobsite, under the same person, Plaintiffs will use common evidence to prove each of these elements. *See Cruz v. TMI*

*Hosp., Inc.*, No. 14-cv-1128 (SRN/FLN), 2015 U.S. Dist. LEXIS 147479, at *26 (D. Minn. 2015) (finding commonality element satisfied where "all of the proposed class members held the same job . . ., worked at the same location . . . , and were supervised by the same person"). As they held the same job, at the same jobsite, under the same person, Plaintiffs will use common evidence to prove each of these elements. In a class case such as this, "[t]he landscape of the total work environment, rather than the subjective experiences of each individual claimant, is the focus for establishing a pattern or practice of unwelcome. . .  harassment." *BreMiller v. Cleveland Psychiatric Inst.*, 195 F.R.D. 1, 25 (N.D. Ohio 2000) (citation omitted). In the Title VII context, courts have held the commonality requirement satisfied when plaintiffs raised the common contention that the class suffered the same injury of an objectively hostile or abusive work environment. *E.g. Howard v. Cook Cty. Sheriff's Office*, No. 17 C 8146, 2019 WL 3776939, at *5-7 (N.D. Ill. Aug. 12, 2019) (finding common question of whether the "ambient harassment" experienced by female employees was sufficiently severe and pervasive to support a hostile work environment claim). hostile).[4]

### 3. Plaintiffs' claims are typical of the claims of the class.

Plaintiffs' claims are "typical of the claims . . . of the class." FED. R. CIV. PROC. 23(a)(3). Plaintiffs all performed work for Defendants at the Lake Charles plant, pursuant to the H-2B visa program, and under the supervision of Defendant Maya. Plaintiffs all worked in the same job position, performing the same duties, under the same terms and conditions of employment. "[I]f the claims of the named plaintiffs and putative class members 'arise from a similar course of conduct and share the same legal theory,' typicality will not be defeated by factual differences." *Adickes v. Hellerstedt*, No. 17-50899, 2018 U.S. App. LEXIS 29034, at *20 (5th Cir. 2018).

### 4. Plaintiffs and Plaintiffs' Counsel can adequately protect the interests of the class.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Adequacy encompasses three separate but related inquiries: (1) 'the zeal and competence of the representative[s'] counsel'; (2) 'the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees'; and (3) the risk of 'conflicts of interest between the named plaintiffs and the class they seek to represent.'" *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 130 (5th Cir. 2005). Plaintiffs' counsel are experienced and accomplished in class action litigation, and they have specific experience representing temporary foreign workers in employment disputes. Rule 23(g)(4) requires that class counsel must "fairly and adequately represent the interests of the class." Named Plaintiffs' counsel are competent to conduct this action and fairly represent the interests of Plaintiffs and the class as a whole. The factors to consider in appointing class counsel pursuant to Rule 23(g) include: "(i) the work counsel has done in identifying or investigating potential claims in this action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in this action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

The attorneys at the Equal Justice Center and Ed Cloutman fulfill these requirements. The Equal Justice Center is a well-known public interest legal organization with substantial experience with and involvement in class and collective action litigation on behalf of low-wage workers, including years of experience representing H-2B guestworkers. (*See* Ex. 28, Dec. C. Willett.) The attorneys from the Equal Justice Center are joined by local counsel, Ed Cloutman, who has extensive litigation experience, which includes experience litigating class actions on behalf of workers. (*See* Ex. 29, Dec. E. Cloutman.) Further, Named Plaintiffs' counsel have invested

significant time in identifying and investigating the claims in this action, and are committed to advancing the costs of this litigation. (Ex. 28.)   For these reasons, the following attorneys should be appointed to serve as class counsel: Christopher J. Willett, Anna Bocchini, Colleen Mulholland, and Ed Cloutman.

The Named Plaintiffs have been active, interested participants in the ligation for five years, since before the related EEOC charge was filed in August 2017. [44] They have no known conflicts of interest with any class members and are unaware of any putative class members who desire to bring their claims in a separate action.[45] Finally, there is no apparent conflict of interest between the potential class members and either the named Plaintiffs or named Plaintiffs' counsel. The named Plaintiffs can only recover if they succeed on legal theories that would also lead to recovery for the class. Moreover, the named Plaintiffs' attorneys' incentives are aligned with the class; their contingent fee agreement with the named Plaintiffs only allows the attorneys to be compensated if they successfully prosecute the suit.

### b. The requirements of Rule 23(b)(3) have been met.

In addition to satisfying the prerequisites of Rule 23(a), a proposed class must also fit within one of the three subcategories of Rule 23(b). Plaintiffs move for class certification pursuant to Rule 23(b)(3). As discussed below, this case easily satisfies both prongs of that subsection: that (1) "questions of law or fact common to members of the class predominate over any questions affecting only individual members" and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

---

[44] Exs. 1-2 at ¶ 24; Ex. 3 at ¶20; Ex. 4 at ¶ 21.
[45] Exs. 1-2 at ¶ 25; Ex. 3 at ¶ 21; Ex. 4 at ¶ 22.

### 1.  Common questions predominate.

Plaintiffs seek to remedy common legal grievances related to Defendants' uniform payroll practices and the ambient hostile, discriminatory working environment Defendants created and fostered. These grievances are shared by all Mexican H-2B workers employed by Defendants and included within the class definition. Shared claims predominate over questions, if any, affecting only individual members of the putative class, and these common questions should be resolved on a class-wide basis. *See In re Deepwater Horizon*, 739 F.3d at 817 ("[T]he predominance inquiry can still be satisfied under Rule 23(b)(3) if the proceedings are structured to establish 'liability on a class-wide basis, with separate hearings to determine—if liability is established—the damages of individual class members.'"). "[R]elatively few motions to certify a class fail because of disparities in the damages suffered by class members." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 306 (5th Cir. 2003). In the present matter, virtually every issue prior to damages is a common one. Big Easy's own 30(b)(6) designee acknowledged with respect to the off-the-clock work, which is a component of both the breach of contract and disparate treatment claims, will necessarily rise or fall on class-wide basis:

> And, again, keep in mind these employees work together. You have transportation there; you have transportation back. So it's not we bring 15, 20 people to work and 10 get to go home and five of them stay there and have to find their way back home. . . But those things, as you correlate and look at them together, state that -- an employee cannot state that they're staying extra or work extra and they get paid for it outside of if now they're saying, hey, we work a 16-hour shift and make an extra hour or two and didn't get paid for that because they're all **-- the whole group would have the same complaint because we're not leaving five people behind and then come back to pick them up later.**

(Ex. 15, Depo. Big Easy Foods 30(b)(6), at 156:18-23; 157:7-16; emphasis added.)

"Plaintiffs have shown common issues govern Defendants' pay obligations under the governing H-2B rules, regulations and documents submitted by Defendants in relation thereto" and the Court should therefore reach the conclusion that common issues predominate with respect to the breach of contract claims. *Casilao v. Hotelmacher LLC*, No. CIV-17-800-SLP, 2021 U.S. Dist. LEXIS 188177, at *29 (W.D. Okla. Sep. 30, 2021). *See also, e.g. Recinos-Recinos*, 233 F.R.D. at 482

("Plaintiffs' AWPA claims contain issues of fact and law which are common to the named plaintiffs and to the potential class members. . . . While a majority of plaintiffs' claims may arise pursuant to the FLSA, Rule 23(b)(3) predominance requires that common questions predominate over individual interests. Plaintiffs' FLSA claims cannot be characterized as individual issues. Therefore, the Court finds that the predominance requirement has been met."); *Moodie*, 309 F.R.D at 379–80 ("Here, common questions of law and fact predominate. Indeed, the claims in the Complaint raise only issues common to the class: (1) whether the contractual wage in Defendant's employment contracts with H-2B workers was the H-2B prevailing wage; . . . (3) whether pre-employment visa and transportation costs were de facto deductions from wages that caused wages to fall below the agreed upon wage; (4) whether the amounts Defendant deducted from H-2B workers wages for housing and transportation costs were excessive, causing wages to fall below the agreed upon wage. . . There are no issues specific to individual Plaintiffs or individual members of the class."); *Rodriguez v. Hermes Landscaping, Inc.*, No. 17-2142, 2018 U.S. Dist. LEXIS 151454, at *15 (D. Kan. 2018) ("Predominant legal issues that are key to each plaintiffs' claim can be resolved for the class based on defendant's own records and the discovery already produced in this case. For plaintiffs' wage rate claims, the court can determine what plaintiffs were entitled to be paid as H-2B or H-2R visa holders and what defendant's policies were on paying workers. Whether the visa documents constituted contracts that required defendant to pay workers a particular rate of pay is another legal question that can be resolved for the class. Although plaintiffs' damages will likely be resolved individually, this is not dispositive.") *Jimenez v. GLK Foods, LLC*, No. 12-C-209, 2014 U.S. Dist. LEXIS 75977, at *35 (E.D. Wis. 2014) ("[Defendant] suggests no other individualized issues that would overwhelm the common questions: (1) did the H-2B documents create contracts with the proposed class members; (2) if so, do these contracts contain terms that guaranteed a specific period of employment at the prevailing wage rate; and (3) did [Defendant] breach these terms?").

Courts certify and try employment discrimination hostile work environment cases based on the two-phase paradigm the Supreme Court established for Title VII pattern-or-practice

government enforcement actions in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358-62 (1977), and approved for use in private Title VII class actions. *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 875-76 & n.9 (1984). Under the *Teamsters* framework, the plaintiff's initial burden is "to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer[.]" 431 U.S. at 360. In other words, discrimination was "standard operating procedure,"—the routine, rather than an unusual practice. *Id.* at 336. At the initial liability stage, the plaintiff "is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy." *Id.* at 360. "[The] burden is to establish a prima facie case that such a policy existed." *Id.* "When the [plaintiff] seeks individual relief for the victims . . . a district court must usually conduct additional proceedings after the liability phase of the trial to determine the scope of individual relief." *Id.* at 361.

The predominance inquiry can be satisfied under Rule 23(b)(3) in this matter by structuring the proceedings to try "liability on a class-wide basis, with separate hearings to determine—if liability is established—the damages of individual class members." In re Deepwater Horizon, 739 F.3d 790, 815–17 (5th Cir. 2014)

All elements of the discrimination claims in the present matter can be determined on a class-wide basis except for subjectivity and compensatory damages. In *Brown v. Cook County*, 332 F.R.D. 229, 233-37, 240-41, 249 (N.D. Ill. 2019),    a Rule 23(b)(3) class of 260 female attorneys harassed by inmates when visiting clients in detention was certified based on the court's determination that common questions, such as whether the harassment was severe or pervasive, predominated because all elements of the hostile environment claims, except for the subjective element, could be resolved class-wide. Id. at 243-46. *See also* Brown v. Nucor Corp., 576 F.3d 149 (4th Cir. 2009) (reversing denial of certification); Brown v. Nucor Corp., 2012 WL 12146620, at *20-27 (D.S.C., Sept. 11, 2012) (denying motion to decertify 200-factory worker class in race harassment case), *vacated in part on other grounds*, 785

29

F.3d 895 (4th Cir. 2015); Warnell v. Ford Motor Co., 189 F.R.D. 383, 386-88 (N.D. Ill. 1999) (certifying class of 850 auto plant workers).

### c. A Class Action is Superior to Other Methods of Adjudication.

A class action is also clearly superior to any other method, and very likely the only feasible method, of adjudicating the claims presented in Plaintiffs' Complaint. Individual actions, controlled by individual Plaintiffs, would burden both the Court and the class. The limited formal education, economic resources, and English proficiency of most Plaintiffs, and their predominate residency in Mexico, would make individual actions impractical and serve as a deterrent to individual class members' enforcement of their rights. *See* Fed. R. Civ. P. 23(b)(3)(A). No other litigation concerning the issues raised by Plaintiffs' complaint has been commenced by or against class members. *See* Fed. R. Civ. P. 23(b)(3)(B). Concentration of the claims in a single forum is desirable, and this forum is appropriate. *See* Fed. R. Civ. P. 23(b)(3)(C). And the benefits of class treatment of the claims in Plaintiffs' complaint are substantial. Class litigation is no less manageable in this case than in other cases in which the claims of migrant workers have been certified under Rule 23. *See* Fed. R. Civ. P. 23(b)(C); *see, e.g.*, *Recinos-Recinos*, 233 F.R.D. at 482; *Moodie*, 309 F.R.D. 370; *Jimenez v. GLK Foods, LLC*, No. 12-C-209, 2014 U.S. Dist. LEXIS 75977 (E.D. Wis. 2014); *DeLeon-Granados v. Eller & Sons Trees, Inc.*, 497 F.3d 1214 (11th Cir. 2007); *Perez-Perez v. Progressive Forestry Servs.*, Civil No. 98-1474-KI, 2000 U.S. Dist. LEXIS 414 (D. Or. 2000).

### IV.    PRAYER

WHEREFORE, Plaintiffs request that:

1. The Court certify the class as defined herein;

2. The named Plaintiffs be named class representatives; and

3. Attorneys Christopher J. Willett, Anna Bocchini, Colleen Mulholland, and Edward B. Cloutman, III be appointed class counsel.

Respectfully Submitted,

LAW OFFICES OF ED CLOUTMAN

/s/ Edward B. Cloutman, III
Edward B. Cloutman, III
(Louisiana Bar No. 04206 & Texas Bar No. 04411000)
618 Largent Avenue
Dallas, Texas 75214
214.232.9015
214.939.9229 (Telecopier)
Email: ecloutman@lawoffices.email

EQUAL JUSTICE CENTER

/s/ Christopher J. Willett
Christopher J. Willett (Admitted Pro Hac Vice)
Texas Bar No. 24061895
Email: cwillett@equaljusticecenter.org
Anna Bocchini (Admitted Pro Hac Vice)
Texas Bar No. 24057410
Email: abocchini@equaljusticecenter.org
Colleen Mulholland (Admitted Pro Hac Vice)
Texas Bar No. 24091765
Email: cmulholland@equaljusticecenter.org
314 E. Highland Mall Blvd., Ste. 401
Austin, Texas 78752
Telephone: (512) 474-0007, ext. 107
Fax: (512) 474-0008

*COUNSEL FOR PLAINTIFFS*

## CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2022, I served a true and correct copy of the foregoing document on Defendants by filing through the CM/ECF system, which provided electronic service to all counsel of record for Defendants:

/s/ Christopher J. Willett
Christopher J. Willett